Becker v. State







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
MARRS AND SMITH PARTNERSHIP,        )                  No. 08-04-00316-CV
)
                                    Appellant,                        )                             Appeal from
)
v.                                                                          )                  143rd District Court
)
D.K. BOYD OIL AND GAS COMPANY,    )                  of Loving County, Texas
INC.,                                                                    )
                                                                             ) (TC# 00-02-708-CVL)
                                    Appellee.                          )


O P I N I O N


            Marrs and Smith Partnership appeals from a judgment in favor of D.K. Boyd Oil and Gas
Company. We affirm in part and reverse and remand in part.
FACTUAL SUMMARY
            D.K. Boyd is the chief executive officer and controlling decision maker of D.K. Boyd Oil &
Gas Company and D.K. Boyd Land & Cattle Company.


 In early 1996, Boyd entered into a real
estate sales contract with the Scarborough-Linebery Foundation to purchase the Frying Pan Ranch
located in parts of Loving, Winkler, and Andrews County, Texas, and Lea County, New Mexico. 
The ranch consists of 136,000 surface acres and 60,170 mineral acres. The prior owners had not
encouraged the development of oil and gas production on the ranch, nor was the ranch being utilized
as a cattle operation. Mr. Boyd believed that both aspects of the ranch had potential for
development. He planned to finance the $13.5 million purchase by borrowing $6 million and selling
portions of the mineral estate to investors to raise the remainder. The Foundation permitted
Mr. Boyd to manage operations of the ranch for several months prior to closing.
            During this time period, Rickey Smith approached Mr. Boyd with a proposal to provide
mineral buyers in exchange for a share of the mineral estate. Smith owns a controlling interest in
Marrs & Smith Partnership (the Partnership) which invests in oil and gas leases. In August of 1996,
Boyd entered into a joint participation agreement with the Partnership.


 The agreement required the
Partnership to pay Boyd $200,000 and to sell 75 percent of the mineral estate for $7.5 million in time
for the closing of the Frying Pan Ranch purchase. If the Partnership succeeded, it would own an
undivided 12 percent interest of Boyd’s retained 24 percent interest in the mineral estate,


 but if it
failed, it would forfeit the $200,000 payment as liquidated damages. The Partnership did not sell
75 percent of the mineral estate and forfeited the $200,000 payment.
            Having failed to obtain a share of the ranch minerals, the Partnership entered into a new
agreement with Boyd on November 27, 1996. Under this purchase and sale agreement, the
Partnership agreed to purchase 20 percent of the mineral estate for $1.6 million.


 Mr. Boyd agreed
to apply the forfeited $200,000 toward the purchase.
            Boyd had obtained extensions of the sales contract from the Scarborough-Linebery
Foundation with the understanding that if the ranch purchase did not close by December 11, 1996,
the sales contract would terminate and Boyd would lose the ranch. On the day before the
December 10, 1996 closing, the Partnership reneged on its obligations under the purchase and sale
agreement which left Boyd short of the purchase price for the ranch. The Partnership proposed a
new agreement: (1) the Partnership would provide Boyd with $1.3 million needed for closing; (2)
Boyd would convey a 20 percent interest in the mineral estate; (3) Boyd would pay $1.7 million to
the Partnership by December 10, 2005 or convey 20 percent of the surface to the Partnership;


 and
(4) the Partnership could claim 20 percent of the annual depreciation on ranch assets. Smith
represented to Mr. Boyd that the $1.7 million could be paid back by including him in future deals
that Boyd put together. Boyd accepted Smith’s terms and closed on the ranch on December 10,
1996. At the closing, Boyd conveyed an undivided 20 percent of the mineral estate to the
Partnership and conveyed other portions of the mineral estate to other purchasers. Boyd retained
approximately 1/3 of the mineral estate. Under the agreement with the Partnership, Boyd also
retained the executive rights to the Partnership’s mineral interest, but the Partnership was entitled
to have the executive rights conveyed upon request.
            After the closing, Boyd presented the Partnership with several prospects in an effort to reduce
the $1.7 million obligation, but all of these were rejected. One of these prospects included Boyd’s
planned purchase of Plains Radio Petroleum in 1998. PRP’s assets included the LE Ranch. As he
had done with the Frying Pan Ranch, Mr. Boyd intended to pre-sell mineral interests to investors,
including Smith and the Partnership, in order to fund the purchase. Smith and Michael Black had
agreed to purchase a 1/3 interest in the mineral estate for a sum certain, but shortly before the
closing, Smith and Black changed the terms of the agreement by demanding a 50 percent interest in
the surface estate. When Boyd rejected their demand, Smith and Black did not participate in the
deal.   On December 16, 1998, Boyd sold several oil and gas leases on the Frying Pan Ranch to SB
Oil Properties, a partnership between Smith and Black. Since the oil and gas production would be
operated by one of Smith’s companies, Smith & Marrs, Inc. (SMI), Boyd required that SMI execute
a Surface Damage Agreement before it assumed operations. Smith, in turn, required Boyd to execute
a document reflecting the $1.7 million obligation that the Partnership and Boyd had entered into two
years earlier at the closing on the Frying Pan Ranch. 
            Following his acquisition of the Frying Pan Ranch, Mr. Boyd organized the surrounding
landowners and coordinated an effort to have Western Geophysical conduct a speculative three
dimensional seismic shoot of the ranch and surrounding areas in order to increase the potential for
development of the minerals. In a speculative shoot, the geophysical company sells seismic data to
different oil and gas companies which can lease the minerals if the data is promising. The
geophysical company typically pays surface damages to the property owner for the right to come onto
the property and conduct the seismic shoot. Western Geophysical agreed to pay $10 per acre to the
property owners, including Boyd. Western permitted Boyd to license the 3D seismic data for $8,000
per section, which is below the rate it normally charged.
            Mr. Boyd continued to pursue efforts to develop the ranch’s oil and gas potential. He hired
a geologist, David Miller, to review all of the data available and to construct subsurface geological
maps of the entire ranch. He also hired Jasha Cultreri, a preeminent geophysicist, to evaluate the 3D
seismic data for potential prospects. Because ownership of the mineral interest was fragmented,
Mr. Boyd retained three landmen to complete mineral deed takeoffs on a substantial portion of the
ranch’s mineral interests. This process took several months and cost Boyd over $100,000.
            In order to take the leases that had been identified by the landmen, Boyd entered into an Oil
and Gas Exploration and Development Agreement with Rutter and Wilbanks Corporation (Rutter)
in 1999. Under this agreement, Rutter reimbursed Boyd for a portion of the expenses already
incurred. Boyd would lease minerals underlying the Frying Pan Ranch based on the mineral deed
takeoffs and assign the leases to Rutter. Rutter, in turn, was required to market these prospects to
oil and gas companies. Prior to reaching this agreement with Rutter, Boyd made the same proposal
to the Partnership, but it declined to participate.
            Over an eleven month period, Boyd’s entire office staff worked exclusively on the
negotiation of approximately 234 oil and gas leases. On August 1, 1999, Boyd leased its own
minerals (the Boyd Lease). Boyd also exercised the retained executive rights on the Partnership’s
minerals and leased those as well (the Smith Lease). The terms of the two leases were identical. On
August 3, 1999, Boyd paid the Partnership the lease bonus for the first year of the Smith Lease in
the amount of $38,144.58. The Smith and Boyd Leases were recorded in Loving County on
August 5, 1999. The Partnership ratified the Smith Lease on August 12, 1999. While Boyd assigned
the Boyd Lease to Rutter, Smith refused to assign the Smith Lease.
            In 1999, Boyd retained Cheyenne Land Management Services to undertake an environmental
audit of potentially contaminated sites on the Frying Pan Ranch. Cheyenne conducted environmental
audits of all sites on the ranch that had potential contamination. Although SMI operated
approximately 3 percent of the wells on the ranch, the audit revealed that the sites operated by SMI
constituted over 47 percent of the total contamination. Consequently, on January 5, 2000, Boyd sent
Smith a letter demanding that SMI comply with the surface damage agreement. Rickey Smith
responded by letter but did not address Boyd’s concerns about contamination. He instead claimed
that the surface damage agreement did not apply to SMI. Smith also asserted that Boyd had breached
its fiduciary duty to the Partnership, and demanded that Boyd immediately pay the $1.7 million
“note.”
            Following this exchange, Smith sent a letter to the Texas Railroad Commission protesting
Boyd’s application for a land farm on the Frying Pan Ranch. Smith represented in the letter that the
Partnership owned a 20 percent interest in the surface estate. As a result of this letter, the
Commission denied approval of the application and Boyd incurred additional costs of $3,760 in the
application process.
            On February 9, 2000, Smith filed suit against Boyd in Cause No. 00-02-708 in Loving
County claiming that the $1.7 million “note” was a present conveyance of 20 percent of the ranch
surface. Based on this claim, Smith also asserted it was entitled to 20 percent of the proceeds from
the surface of the ranch.
            That same month, Rutter and Boyd negotiated with Titan Resources a farmout agreement of
the leases Boyd and Rutter had taken pursuant to the Rutter Agreement. Although Boyd had
assigned the Boyd Lease and 232 other leases to Rutter, it had not assigned the Smith Lease because
Smith had refused to grant the assignment. As part of the farmout to Titan, Boyd entered into a new
surface damage agreement with Titan at its request. Under the terms of this agreement, Titan paid
only $75,000 as surface damages for drilling a well referred to as the Titan Well, rather than the
$102,000 which would have been due under Boyd’s standard surface damage agreement.
            At Boyd’s request, Titan furnished Smith a draft copy of the Titan farmout and surface
damage agreement proposed for the leases and asked that it approve the assignment and farmout
agreement. On March 16, 2000, Smith’s attorney sent Titan a letter purporting to rescind the Smith
Lease, and claiming ownership of 20 percent of the surface estate. The letter demanded that 20
percent of the surface damages paid by Titan for drilling the well be paid into the registry of the
court. The letter also represented that the Partnership had amended its suit to seek rescission of the
Smith Lease and it threatened to sue the participants in the farmout agreement.
            At this point, Titan had a drilling contract and an available rig, but was unable to proceed
without Smith’s participation. Even though the Smith Lease constituted only a fraction of the leases
necessary to drill the Titan Well, the Partnership was able to force the other parties to accept its
terms in order to get the well drilled. The Partnership thus negotiated a farmout agreement with
Titan and Boyd that paid an additional $300 per net mineral acre leasing bonus. Under the Rutter
Agreement, one-half of that additional leasing bonus should have been paid to Boyd, but under the
farmout agreement negotiated by the Partnership, Boyd’s half of the bonus in the amount of $3,018
was instead paid to the Partnership and the Black Family Partnership.
            Boyd subsequently ignored the Partnership’s claimed repudiation of the Smith Lease and on
July 24, 2000 tendered a check to the Partnership in the amount of $36,441.87 as payment of the
lease bonus due to extend the Smith Lease. The Partnership returned the check on August 14, 2000. 
On July 25, 2001, Boyd tendered the lease bonus due to the Partnership to extend the Smith Lease
a third year, but the Partnership returned this check as well. 
            The trial court granted summary judgment in favor of Boyd on Smith’s claimed ownership
of 20 percent of the surface estate and severed all claims related to ownership of the surface estate
into cause number 00-08-713. We affirmed the summary judgment in part, but reversed and
remanded in part because a fact issue existed with respect to Smith’s claim of mutual mistake. 
Marrs and Smith, Partnership v. D.K. Boyd Oil and Gas Co., Inc., No. 08-00-00386-CV, 2002 WL
1445334 (Tex.App.--El Paso 2002, no pet.)(not designated for publication). On remand, the trial
court rejected the Partnership’s claim of mutual mistake but reformed the agreement originally
executed on December 16, 1998 to show an effective date of December 10, 1996.



            In this case, the Partnership sought a declaratory judgment related to the Legend Resources
mineral purchase. The Partnership also sued Boyd for breach of fiduciary duty related to the
executive rights which Boyd had retained. More specifically, the Partnership claimed that Boyd had
obtained more favorable terms for itself than the Partnership in several transactions, including the
Boyd Lease, the farmout and oil and gas development agreements, surface damage agreements, and
seismic options. Boyd asserted counterclaims against the Partnership for tortious interference and
slander of title. The case was tried to the court in February 2001 and final judgment was entered
on September 3, 2004. The court determined that:
1. the Partnership did not rescind the August 1, 1999 lease;
2. the Partnership did not rescind the ratification of the Smith Lease;
3. the Smith Lease was repudiated prior to trial;
4. the Smith Lease contains identical material provisions as the Boyd Lease; and
5. Boyd has fully performed any obligations owed to the Partnership with respect to
the Legend Resources mineral purchase and paid the Partnership all the benefits due
from such purchase. 

The court further ordered that Boyd recover from the Partnership the sum of $6,778 in actual
damages, $50,000 in punitive damages, and $187,185.10 in attorney’s fees through trial plus
additional attorney’s fees for post-trial and appellate proceedings. The court determined that the
Partnership take nothing on its claims, except for a setoff in the amount of $5,000. 
FAILURE TO FILE FINDINGS OF FACT
            In its first point of error, the Partnership complains that the trial court erred by failing to file
findings of fact and conclusions of law. The court ordered the parties to prepare non-binding
proposed findings of fact and conclusions of law which were to be filed prior to the beginning of the
bench trial: 
Neither party shall be bound by its pre-trial filing of such proposed findings, but the
same shall be utilized by the Court to organize its consideration of the evidence and
to better prepare for trial.

At the conclusion of the trial, the court sent the parties its draft findings which were not in final form
but gave a “strong indication of the Court’s position.” The letter directed Boyd’s counsel to draft
a judgment consistent with the findings and an entry of judgment hearing was scheduled for
September 3, 2004. The Partnership filed written objections to several of the proposed findings on
the ground that they were not supported by the evidence, were contrary to established law, or were
irrelevant to the causes of action before the court. The motion requested only that the court sustain
its objections to the proposed findings and conclusions. At the entry hearing, the court resolved
various concerns before signing the written judgment. The Partnership never filed a written request
for formal findings of fact and conclusions of law. 
            Rule 296 of the Texas Rules of Civil Procedure provides that in a non-jury trial, a party may
request the court to state its findings of fact and conclusions of law. Tex.R.Civ.P. 296. The request
must be in writing, must be entitled “Request for Findings of Fact and Conclusions of Law,” and
must be filed with the clerk of the court within twenty days after the judgment is signed. Id. The
trial court is not required to file its findings absent a timely request. See Tex.R.Civ.P. 297. The
Partnership candidly admits that it did not file a written request pursuant to Rule 296, but argues that
it was entitled to rely on the court’s representation that it would enter findings. This argument fails
for two reasons. First, the record does not support the assertion that the court represented it would
file findings of fact. The court asked the parties to prepare proposed findings to assist the court in
its understanding of the evidence. Nothing in the post-trial letter indicated that the court intended
to file its draft. Second, the Partnership cites no authority which would allow us to create an
exception to the plain requirement of Rule 296 that a party desiring written findings of fact and
conclusions of law must file a formal written request. The purpose of Rule 296 is to give a party a
right to findings of fact and conclusions of law finally adjudicated after a conventional trial on the
merits before the court. IKB Industries (Nigeria) Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 442 (Tex.
1997). This right is contingent upon compliance with Rule 296. Because the trial court did not err
by failing to file written findings, we overrule Point of Error One. 
BREACH OF FIDUCIARY DUTY
            In Points of Error Two through Five, the Partnership challenges the legal and factual
sufficiency of the evidence supporting the court’s determination that Boyd did not breach its
fiduciary duty in the exercise of the Partnership’s executive rights. 
Standards of Review
            In a non-jury trial where no findings of fact or conclusions of law are filed, we presume that
the trial court made all the findings necessary to support its judgment. Holt Atherton Industries, Inc.
v. Heine, 835 S.W.2d 80, 83 (Tex. 1992). When a reporter’s record is part of the appellate record,
these implied findings may be challenged by legal or factual insufficiency points. Id. at 84. The
applicable standard of review is the same as that applied in the review of jury findings or a trial
court’s findings of fact. 
            The Partnership bore the burden of proof on its breach of fiduciary duty cause of action and
its issues for review are appropriately framed as challenges to the court’s failure to find in its favor. 
When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for
which it had the burden of proof, an appellant must demonstrate that the evidence conclusively
established all vital facts in support of the issue. Sterner v. Marathon Oil Company, 767 S.W.2d
686, 690 (Tex. 1989); In re Estate of Livingston, 999 S.W.2d 874, 879 (Tex.App.--El Paso 1999, no
pet.). A party attempting to overcome an adverse fact finding as a matter of law must surmount two
hurdles. Sterner, 767 S.W.2d at 690; In re Estate of Livingston, 999 S.W.2d at 879. First, the record
must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. 
Sterner, 767 S.W.2d at 690; In re Estate of Livingston, 999 S.W.2d at 879. Second, if there is no
evidence to support the finding, then the entire record must be examined to see if the contrary
proposition is established as a matter of law. Sterner, 767 S.W.2d at 690; In re Estate of Livingston,
999 S.W.2d at 879. Only if the contrary position is conclusively established will the point of error
be sustained. In re Estate of Livingston, 999 S.W.2d at 879-80.
            In reviewing the factual sufficiency of the evidence, we consider all of the evidence in the
record. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). If a party is attacking the factual
sufficiency of an issue upon which it had the burden of proof, it must demonstrate that the adverse
finding is against the great weight and preponderance of the evidence. Croucher v. Croucher, 660
S.W.2d 55, 58 (Tex. 1983). In reviewing a factual sufficiency issue, we must first examine the
record to determine if there is some evidence to support the finding; if so, then we must determine
whether the failure to find is so contrary to the overwhelming weight and preponderance of the
evidence as to be clearly wrong and manifestly unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986). We may reverse only when we conclude that the non-finding is against the great weight and
preponderance of the evidence. Ames v. Ames, 776 S.W.2d 154, 158 (Tex. 1989).
Elements of the Cause of Action
            For a party to establish a claim for breach of a fiduciary duty, there must exist a fiduciary
relationship between the plaintiff and defendant, the defendant must have breached its fiduciary duty
to the plaintiff, and the defendant’s breach must have resulted in an injury to the plaintiff or a benefit
to the defendant. See Burrow v. Arce, 997 S.W.2d 229, 238-39 (Tex. 1999); Punts v. Wilson, 137
S.W.3d 889, 891 (Tex.App.--Texarkana 2004, no pet.). Where the underlying facts are undisputed, 
the existence and breach of fiduciary duties are questions of law exclusively within the province of
the trial court. Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005). We review questions of law
de novo. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002).
            In order for the Partnership to prevail on its legal sufficiency challenges, the record must first
demonstrate that there is no evidence to support the implied adverse finding on each element. We
must then determine that the contrary proposition is established as a matter of law. With respect to
the “against the great weight and preponderance” claims, the record must reflect that the adverse
finding on each element is against the great weight and preponderance of the evidence.
Fiduciary Duty Owed by Executive Rights Holder
            The owner of a mineral estate possesses a bundle of interests which can be separated,
conveyed, or reserved upon any terms as the mineral owner deems proper. Schlittler v. Smith, 128
Tex. 628, 101 S.W.2d 543, 545 (Tex.Comm’n App. 1937, opinion adopted); Elick v. Champlin
Petroleum Company, 697 S.W.2d 1, 4 (Tex.App.--Houston [14th Dist.] 1985, writ ref’d n.r.e.).
These mineral rights consist of the rights to participate in bonuses, rentals, and royalties; the
exclusive right to enter the premises for the purpose of drilling; and the right to execute oil, gas and
mineral leases. Elick, 697 S.W.2d at 4. In the December 10, 1996 mineral deed, Boyd conveyed a
20 percent mineral interest in the Frying Pan Ranch to the Partnership, but retained all executive
rights, including the right to grant and convey oil, gas, and mineral leases.
            Following the 1937 decision in Schlittler v. Smith, Texas courts generally applied the
standard of “utmost good faith” to one who exercises executive rights to lease or develop minerals. 
Dearing, Inc. v. Spiller, 824 S.W.2d 728, 732 (Tex.App.--Fort Worth 1992, writ denied). The duty
of utmost good faith requires the executive rights holder to execute the same type of oil and gas lease
on the same terms as he would have done in the absence of an outstanding, nonparticipating interest
in a third party. Hlavinka v. Hancock, 116 S.W.3d 412, 417 (Tex.App.--Corpus Christi 2003, pet.
denied). This is a more stringent standard than simple good faith but is generally considered a lesser
standard than a true fiduciary obligation. Dearing, 824 S.W.2d at 732. However, in Manges v.
Guerra, 673 S.W.2d 180, 183 (Tex. 1984), the Texas Supreme Court equated the utmost good faith
standard with a fiduciary obligation. Cases interpreting Manges have concluded that when the
executive and non-executive are co-tenants in the mineral estate and there is a relationship of trust
and confidence between the parties, a fiduciary relationship exists between the executive and non-executive mineral interest owner. Hlavinka, 116 S.W.3d at 417 n.3, citing Marathon Oil Co. v.
Moye, 893 S.W.2d 585, 591 (Tex.App.--Dallas 1994, orig. proceeding) and Pickens v. Hope, 764
S.W.2d 256, 267 (Tex.App.--San Antonio 1988, writ denied). Manges did not apply the customary
standard that the fiduciary must subordinate its own interest to those of the non-participating interest
owner, but instead charged the fiduciary with acquiring for the non-executive every benefit that he
exacts for himself. See Manges, 673 S.W.2d at 183. Under Manges, Boyd owed the Partnership a
duty to acquire for the Partnership every benefit exacted for itself with respect to the mineral interest,
but this fiduciary duty only existed with respect to Boyd’s exercise of the executive rights.
The Smith Lease
            In its second point of error, the Partnership argues that Boyd breached its fiduciary duty by
executing the Smith Lease under different terms than Boyd obtained for itself. The trial court
expressly found that the applicable terms of the Smith Lease were identical to the terms of Boyd
Lease. Mr. Boyd testified that the material terms of the Smith Lease and Boyd Lease were identical
and were the best terms of any of the 234 mineral leases on the ranch. Our review of the two leases
confirms that the terms related to the mineral interest were identical. While the Partnership points
to seven paragraphs in the Boyd Lease which are either not found in the Smith Lease or vary from
those found in the Smith Lease, it does not show how these terms relate to the mineral interest as
opposed to Boyd’s surface interest. These seven paragraphs relate to the surface estate as they
concern removal of surface facilities and equipment, the location of drilling rigs and pulling units,
indemnity relating to possible surface contamination, and a requirement that the lessee obtain
automobile insurance. We agree with the trial court that the material terms of the leases are
identical. The Partnership has failed to establish that there is no evidence supporting the adverse
finding, and therefore, its legal sufficiency contention fails.
            With respect to factual sufficiency, the record does not reflect that the adverse finding as to
the breach element is against the great weight and preponderance of the evidence. Because the
material terms of the Smith Lease and Boyd Lease are identical, the court’s implied finding that
Boyd did not breach its fiduciary duty is not against the great weight and preponderance of the
evidence. Point of Error Two is overruled.
The Rutter Agreement and Titan Farmout
            In Point of Error Three, the Partnership contends that Boyd breached its fiduciary duty by
entering into the Rutter Agreement and the Titan Farmout without obtaining the same benefits for
the Partnership. We will first consider the Partnership’s argument as it pertains to the Rutter
Agreement. The Partnership asserts that under the Rutter Agreement, Boyd obtained the following
benefits without obtaining them for the Partnership: consideration in the amount of $28,000,
additional compensation in the form of leasing seismic data at a reduced rate, compensation to Boyd
for the sale of seismic data, additional leasing bonuses, and a right to participate on a prospect-by-prospect basis for an additional 6.25 percent working interest. Boyd responds and the record reflects
that these benefits were obtained in exchange for the substantial expenditures of time and money by
Mr. Boyd to develop the minerals and that the Partnership refused to participate in the venture or
share the expenses. The evidence supports the trial court’s implied finding that Boyd did not breach
its fiduciary duty to the Partnership by entering into the Rutter Agreement. The legal sufficiency
claim is without merit.
            Viewing all of the evidence under the factual sufficiency standard, we conclude that the
adverse finding as to the breach element is not against the great weight and preponderance of the
evidence. The evidence established that Boyd obtained the benefits in the Rutter Agreement based
on Mr. Boyd’s efforts and expense and not through the exercise of the executive interest. 
Consequently, Boyd had no obligation to obtain the same benefits for the Partnership. 
            With respect to the Titan Farmout, the Partnership complains that the original farmout
agreement negotiated between Boyd and Titan contained additional terms favorable to Boyd. 
Because the Partnership refused to assign its lease and rejected this farmout agreement, it was never
executed. The agreement ultimately reached by all of the parties did not include those additional
terms. Even if it could be said that Boyd’s negotiation of the Titan Farmout constituted a breach of
fiduciary duty, a matter which we need not reach, the Partnership has suffered no damages since the
original agreement was never executed. We cannot conclude that the adverse finding is not
supported by any evidence nor that it is against the great weight and preponderance of the evidence. 
For these reasons, Point of Error Three is overruled.
The Surface Damage Agreement
            In Point of Error Four, the Partnership challenges the sufficiency of the evidence supporting
the implied finding that Boyd did not breach its fiduciary duty by entering into the surface damage
agreement with Titan Resources. As the executive interest owner, Boyd’s executive duty extended
to the negotiation of surface damages insofar as the surface damage payments were a substitute for
a larger bonus, royalty, or other benefit that would have to be shared with the co-mineral owners. 
Hlavinka, 116 S.W.3d at 421. An executive acts improperly in negotiating for surface damage
payments that reduce the size of the bonus, royalty, or other benefit which would have to be shared
with the non-executive. Id.
            Citing Portwood v. Buckalew, 521 S.W.2d 904 (Tex.Civ.App.--Tyler 1975, writ ref’d n.r.e.),
the Partnership suggests that the sum Boyd was to receive as surface damages is, in actuality, a
leasing bonus and royalty which Boyd must share pro-rata with the Partnership. It argues that Boyd
breached its fiduciary duty by failing to obtain these benefits for the Partnership. In Portwood,
landowners were parties to a partition agreement dividing the surface estate of the ranch and giving
the grantee of each respective tract executive leasing rights for minerals in the tract for the benefit
of all the parties. Id. at 911. By virtue of this agreement, the non-executives were granted a right
to participate in all royalties and bonuses. Id. at 909. One surface landowner executed an oil and
gas lease on behalf of the non-executives, but she also entered into a separate agreement for a
25 percent overriding royalty for herself. Id. at 911. She did not inform the other parties of the
25 percent overriding royalty. Id. The non-executive sued the landowner for breach of her duty to
use utmost fair dealing in executing the oil and gas leases on behalf of the non-executive. Id. at 909. 
At trial, the landowner testified that she acquired the 25 percent royalty in lieu of surface damages. 
Id. The jury found that the 25 percent overriding royalty was not part of the bonus paid by the lessee,
but the trial court disregarded the finding and entered judgment in favor of the non-executive. Id.
at 912. The court of civil appeals rejected the landowner’s argument that the 25 percent royalty was
in lieu of surface damages and held that an instrument must be construed for what it is, regardless
of the interpretation placed on it by the parties. Id. at 913. Rather than supporting the Partnership’s
position, Portwood undercuts it.
            Applying Portwood, we conclude that the surface damage agreement must be construed for
what it is rather than the interpretation that the Partnership would give it absent any evidence to
support that interpretation. Simply put, the agreement compensates Boyd for surface damages and
there is no evidence to indicate that the surface damages were in lieu of royalties or other payments
to which the Partnership would have been entitled to a pro rata share. The Partnership has not
shown that the adverse finding is not supported by any evidence or that it is against the great weight
and preponderance of the evidence. For these reasons, Point of Error Four is overruled.
 

The Western Geophysical Seismic Shoot
            In Point of Error Five, the Partnership challenges the sufficiency of the evidence supporting
the adverse finding on its breach of fiduciary claim related to the Western Geophysical seismic
shoot. The Partnership alleged that Boyd breached its fiduciary duty by entering into an agreement
with Western Geophysical for a speculative seismic shoot rather than obtaining $25 per net mineral
acre for a proprietary seismic shoot. The Partnership cites no evidence that Boyd rejected an offer
to do a proprietary seismic shoot and instead pursued a speculative shoot. To the contrary, the
evidence established that Mr. Boyd made presentations to at least fifty companies in an effort to
obtain a proprietary seismic shoot which would have resulted in option payments to the Partnership,
but he did not find a company that would agree to undertake the project. The only course of action
available was the speculative seismic shoot. Because there is some evidence supporting the adverse
finding, the Partnership’s legal sufficiency argument is without merit. Likewise, in the absence of
any evidence that Boyd arbitrarily chose to pursue a speculative shoot rather than a proprietary shoot,
the adverse finding is not against the great weight and preponderance of the evidence. Point of Error
Five is overruled.
TRIAL BY CONSENT
            In Point of Error Six, the Partnership complains that the trial court erred by failing to allow
recovery of the leasing bonus payments for the first and second option years of the Smith Lease. The
Smith Lease provided Boyd with the option of extending the one year lease by tendering payment
of the lease bonus to the Partnership. In 1999, Boyd paid the Partnership the lease bonus for the first
year of the Smith Lease in the amount of $38,144.58. In 2000, Boyd tendered a check to the
Partnership in the amount of $36,441.87, but the Partnership repudiated the lease and returned the
check. Likewise, in 2001, the Partnership returned a check in the amount of $29,488.29 which had
been tendered as payment of the lease bonus due for the second option year. 
            By its pleadings, the Partnership sought to have the Smith Lease rescinded. This theory is
set forth in the Partnership’s proposed findings of fact. Proposed conclusion of law #11 stated that
based on Boyd’s breach of fiduciary duty, the Partnership was entitled to rescind the ratification and
the oil and gas lease and was also entitled to damages in the amount of $36,999.39. Neither the
pleadings nor the proposed findings and conclusions include a claim for recovery of the lease
bonuses rejected by the Partnership and returned to Boyd. More than three years after the trial had
concluded, the court indicated in its draft findings that it was inclined to rule against the Partnership
on rescission and breach of fiduciary duty claims. The Partnership filed a written objection to the
proposed judgment on the ground that it did not award recovery of the lease bonus payments. At the
hearing on the entry of final judgment, the trial court determined that the Partnership’s pleadings did
not seek recovery of the lease bonus and that the issue was not tried by consent. 
            A judgment must conform to the pleadings and proof. Tex.R.Civ.P. 301. A plaintiff may
not be granted a favorable judgment on an unpled cause of action, absent trial by consent. See Oil
Field Haulers Ass’n v. Railroad Commission, 381 S.W.2d 183, 191 (Tex. 1964). The Partnership
argues that it raised the claim in its fifth amended petition. In those pleadings, the Partnership sought
rescission of the Smith Lease, or alternatively, a declaration that the lease expired because Boyd
failed to pay the leasing bonus due or pay that amount into the registry of the court. Nothing in the
pleadings can be construed as raising a claim for recovery of the lease bonus payments.
            Rule 67 of the Texas Rules of Civil Procedure provides that when issues not raised by the
pleadings are tried by implied consent, they must be treated in all respects as if they had been raised
in the pleadings. Tex.R.Civ.P. 67; Gutierrez v. Gutierrez, 86 S.W.3d 721, 729 (Tex.App.--El Paso
2002, no pet.). This rule is limited to those exceptional cases where it clearly appears from the
record as a whole that the parties tried an unpled issue by consent. Gutierrez, 86 S.W.3d at 729; In
the Interest of Walters, 39 S.W.3d 280, 289 (Tex.App.--Texarkana 2001, no writ); Stephanz v. Laird,
846 S.W.2d 895, 901 (Tex.App.--Houston [1st Dist.] 1993, writ denied). It is not intended to
establish a general rule of practice; it should be applied with care, and never in a doubtful situation. 
Stephanz, 846 S.W.2d at 901. Trial by implied consent “applies only where it appears from the
record that the issue was actually tried, although not pleaded.” Johnston v. McKinney American,
Inc., 9 S.W.3d 271, 281 (Tex.App.--Houston [14th Dist.] 1999, pet. denied). To determine whether
the issue was tried by consent, the court must examine the record not for evidence of the issue, but
rather for evidence of trial of the issue. Stephanz, 846 S.W.2d at 901. When evidence relevant to
both a pled and an unpled issue has been admitted without objection, the doctrine of trial by consent
should not be applied unless clearly warranted. Johnston, 9 S.W.3d at 281.
            The Partnership points to the following exchange between Rickey Smith and plaintiff’s
counsel as an indication that the issue was tried by consent:
[Plaintiff’s counsel]: Now, Mr. Smith, are you seeking any other damages regarding
this lease [Plaintiff’s Exhibit 19] other than rescission?
 
[Mr. Smith]: Yes.
 
[Plaintiff’s counsel]: What are you seeking?
 
[Mr. Smith]: The money that I sent back. 

                        *                      *                      *                      *                      *
 
[Plaintiff’s counsel]: Are you seeking additional damages?
 
[Mr. Smith]: Yes.
 
[Plaintiff’s counsel]: What damages are you seeking?
 
[Mr. Smith]: The money that I had to send back where I was unable to lease my
leases back.
 
[Plaintiff’s counsel]: Why are you seeking that if you sent it back?
 
[Mr. Smith]: I don’t have them. They’re not rescinding them; and I haven’t been
able to negotiate and re-lease them.

When considered in context, this exchange related to a pled cause of action, namely, the
Partnership’s breach of fiduciary duty claim. While Mr. Smith’s testimony might be said to also raise
an unpled cause of action for recovery of the rejected lease bonuses, the record does not reflect that
the parties tried that unpled cause of action by consent. Because the trial court did not err by failing
to award recovery of the lease bonuses to the Partnership, we overrule Point of Error Six.
TORTIOUS INTERFERENCE
            In Point of Error Seven, the Partnership challenges the legal sufficiency of the evidence to
prove that the Partnership tortiously interfered with any prospective contract or business relationship
since Boyd entered into agreements with the Rutter Group and Titan Resources. The Partnership
additionally argues that it established its affirmative defenses of privilege and justification.
Tortious Interference with Contract 
            Boyd’s pleadings alleged that the Partnership tortiously interfered with its contractual
relationship with Rutter and Titan. The elements of tortious interference with a contractual
relationship are the existence of a contract, the willful or intentional act of interference that was a
proximate cause of damages, and actual damage or loss occurred. Aguilar v. Morales, 162 S.W.3d
825, 837 (Tex.App.--El Paso 2005, pet. denied); Hopkins v. Highlands Ins. Co., 838 S.W.2d 819,
824 (Tex.App.--El Paso 1992, no pet.). Even if a plaintiff establishes these elements, a defendant
may still prevail by establishing the affirmative defense of justification. Texas Beef Cattle Co. v.
Green, 921 S.W.2d 203, 211 (Tex. 1996). Justification is an affirmative defense to tortious
interference with contract based on either the exercise of one’s own legal rights, or a good faith claim
to a colorable legal right, even though that claim ultimately proves to be mistaken. Id.
            Under the Rutter Agreement, Boyd and Rutter would each receive one-half of a 5 percent
override on the leases it had contributed to the Titan Farmout. The override was intended to
compensate Boyd for the out-of-pocket expenses incurred in acquiring the leases. Boyd had also
negotiated a farmout agreement with Titan. The Partnership, claiming that Boyd had breached its
fiduciary duty with respect to the Smith Lease, repudiated the lease and informed Titan that it would
lease its interest to Titan under the same terms and conditions set forth in the Boyd Lease. 
Additionally, the Partnership would participate (pro rata) in the farmout agreement under the same
terms and conditions as Boyd. The Partnership also demanded that Titan pay all of the surface
damages into the registry of the court. Finally, the letter informed Titan that the Partnership did not
waive any claim for actual or punitive damages against any participants in the farmout agreement. 
In a second letter, the Partnership reiterated its demand for a lease, farmout agreement, and surface
damage agreement under the same terms as those given to Boyd. The Partnership also demanded
that Titan pay 20 percent of the total surface damages into the registry of the court. 
            Titan needed to go forward with the project since it had entered into a drilling contract and
had a rig ready to move. Consequently, Titan persuaded Boyd to alter the terms of the farmout
agreement to give the Partnership Boyd’s portion of the 5 percent override. The Partnership received
a $300 per net mineral acre additional leasing bonus or farmout bonus in the amount of $3,018 which
would have otherwise gone to Boyd. 
            This evidence is legally sufficient to establish the elements of tortious interference with a
contract. The Partnership argues that because it had a legal right to negotiate with Titan in exchange
for its consent to the assignment and farmout, its interference with the contractual relationship is
justified. But the Partnership did not merely obtain consideration in exchange for its consent; it
instead attempted to negotiate its own mineral lease and farmout agreement. At the time the
Partnership took these actions, Boyd still retained the executive rights and the Partnership did not
have a legal right or a colorable legal right to lease the minerals or participate in the negotiation of
the farmout agreement. See Hlavinka, 116 S.W.3d at 418 (where one party owned the exclusive
executive rights to the tract, the non-executives had no right to participate in oil and gas leasing). 
Because there is evidence in the record supporting the implied adverse finding as to the justification
affirmative defense, the Partnership’s legal sufficiency argument fails. Point of Error Seven is
overruled.
Slander of Title/Tortious Interference with Property
            In Point of Error Eight, the Partnership contends that the evidence is legally insufficient to
support the award of damages under Boyd’s slander of title cause of action because Boyd failed to
offer any evidence proving the loss of a specific sale. “Slander of title” is defined as a false and
malicious statement made in disparagement of a person’s title to property which causes special
damages. Sadler v. Duvall, 815 S.W.2d 285, 293 (Tex.App.--Texarkana 1991, writ denied). The
requisite elements include the uttering and publishing of disparaging words that were false and
malicious; that the plaintiff sustained special damages thereby; and that the plaintiff possessed an
interest in the property disparaged. Hill v. Heritage Resources, Inc., 964 S.W.2d 89, 109-10
(Tex.App.--El Paso 1997, pet. denied). The plaintiff must demonstrate the loss of a specific sale in
order to recover. Hill, 964 S.W.2d at 115-16.
            As part of a plan to develop a land farm on the Frying Pan Ranch, Boyd


 submitted an
application with the Texas Railroad Commission for a commercial surface disposal facility permit
for the land treatment of non-hazardous crude oil contaminated soil from spills or leaks. On
February 3, 2000, only a few days after the exchange of letters between the Partnership and Boyd
regarding contamination on the ranch, the Partnership sent a letter to the Commission protesting the
application for a land farm. In that letter, the Partnership alleged for the first time that it owned a
20 percent interest in the ranch surface. As a result of this letter, the Commission could not process
the application administratively and Boyd had to hire counsel. Consequently, Boyd incurred
additional costs of $3,760 in the application process.
            Because there is no evidence in the record proving the loss of a specific sale, the evidence
is legally insufficient to support an award of damages for slander of title. But the Partnership fails
to address whether another theory of recovery supports the award. Because the Partnership did not
request findings of fact, we must presume that the trial court made all findings necessary to support
its judgment. Pharo v. Chambers County, Texas, 922 S.W.2d 945, 948 (Tex. 1996); Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990). If the trial court’s implied findings are supported by the
evidence, we must uphold the judgment on any theory of law applicable to the case. Worford, 801
S.W.2d at 109. 
            Boyd’s pleadings included an allegation that the Partnership tortiously interfered with its
property rights. A cause of action for tortious interference with peaceful use and enjoyment of
property is, in essence, a claim for intentional invasion of, or interference with, property rights. Ski
River Development, Inc. v. McCalla, 167 S.W.3d 121, 140 (Tex.App.--Waco 2005, no pet.); Suprise
v. DeKock, 84 S.W.3d 378, 382-83 (Tex.App.--Corpus Christi 2002, no pet.). To prevail, Boyd was
required to prove that the Partnership intentionally interfered with Boyd’s property rights. The
evidence relevant to the slander of title claim is legally sufficient to prove that the Partnership
intentionally interfered with Boyd’s property rights causing injury. Because the trial court’s implied
finding is supported by the evidence, the judgment will be upheld on this theory. Point of Error
Eight is overruled.
EXEMPLARY DAMAGES
            In its ninth point of error, the Partnership challenges the legal sufficiency of the evidence
supporting the award of exemplary damages.


 It contends that exemplary damages are not available
because actual damages should not have been awarded, and that Boyd failed to prove by clear and
convincing evidence that the Partnership acted with malice. 
            Exemplary damages may be awarded only if damages other than nominal damages are
awarded. Tex.Civ.Prac.&Rem.Code Ann. § 41.004(a)(Vernon Supp. 2005). We have already
determined that the evidence is sufficient to sustain the award of actual damages. Therefore, the
Partnership’s first argument is without merit.
            Boyd was required to prove by clear and convincing evidence that the harm it suffered
resulted from malice. Tex.Civ.Prac.&Rem.Code Ann. § 41.003(a)(2), (b). Malice is defined to
mean a specific intent by the defendant to cause substantial injury or harm to the claimant. 
Tex.Civ.Prac.&Rem.Code Ann. § 41.001(7).


 Specific intent means that the actor desires to cause
the consequences of his act, or he believes the consequences are substantially certain to result from
it. Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985). Malice may be proven by direct
or circumstantial evidence. See Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex. 1998);
Mission Resources, Inc. v. Garza Energy Trust, 166 S.W.3d 301, 314 (Tex.App.--Corpus Christi
2005, pet. filed).
            In reviewing the evidence for legal sufficiency under the clear and convincing standard, we
must determine whether the evidence is such that a factfinder could reasonably form a firm belief
or conviction that its finding was true. Southwestern Bell Telephone Co. v. Garza, 164 S.W.3d 607,
627 (Tex. 2004); see Tex.Civ.Prac.&Rem.Code Ann. § 41.001(2)(“Clear and convincing” means
the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.). We must review all the
evidence in the light most favorable to the finding, giving appropriate deference to the factfinder’s
conclusions. Garza, 164 S.W.3d at 627. This means that a reviewing court must assume that the
factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. Id. 
A corollary to this requirement is that a court should disregard all evidence a reasonable factfinder
could have disbelieved, but we must consider undisputed evidence even if it does not support the
finding. Id. If a court determines that no reasonable factfinder could form a firm belief or conviction
that the matter that must be proven is true, then the court must find the evidence legally insufficient. 
Id.
            The Partnership’s argument focuses primarily on the evidence relating to its claim of a
20 percent ownership in the surface of the Frying Pan Ranch. The Partnership contends that because
there is evidence showing it had a good faith belief in its claim to the 20 percent surface interest, its
assertion of that claim could not have been done with a specific intent to harm or cause injury to
Boyd. We need not consider whether this particular evidence is sufficient to sustain the malice
finding because there is other evidence in the record indicating that the Partnership acted with malice
in tortiously interfering with Boyd’s contractual relationships with Rutter and Titan. The
Partnership, through its threats of litigation against all parties to the Farmout Agreement, inserted
itself into the negotiation of the Titan Farmout even though it did not have a legal right to do so since
Boyd still retained the executive rights. See Hlavinka, 116 S.W.3d at 418 (where one party owned
the exclusive executive rights to the tract, the non-executives had no right to participate in oil and
gas leasing). This evidence is legally sufficient to support the court’s conclusion that the Partnership
tortiously interfered with Boyd’s contractual relationship with a specific intent to harm or cause
injury to Boyd. Point of Error Nine is overruled.
BOYD’S ATTORNEY’S FEES AND PREJUDGMENT INTEREST
            In Point of Error Ten, the Partnership challenges the award of attorney’s fees and
prejudgment interest on attorney’s fees. It first contends that the award is improper because Boyd
failed to segregate. The party seeking attorney’s fees has the duty to segregate the attorney’s fees
incurred for the claims where attorney’s fees are recoverable from those claims where attorney’s fees
are not recoverable. Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991). A failure
to segregate attorney’s fees can result in a judgment rendering no attorney’s fees or remanding the
case for more evidence on the issue. Id. at 11. Segregation is not required if the claims arise out of
the same transaction and are so interrelated that their prosecution or defense requires proof or denial
of essentially the same facts. Sterling, 822 S.W.2d at 11; Z.A.O., Inc. v. Yarbrough Drive Center
Joint Venture, 50 S.W.3d 531, 550 (Tex.App.--El Paso 2001, no pet.). When causes of action
involved in a suit are dependent upon the same set of facts or circumstances and are intertwined to
the point of being inseparable, the party suing for attorney’s fees may recover the entire amount
covering all claims. Sterling, 822 S.W.2d at 11. The determination of whether attorney’s fees can
be segregated between various claims or defenses is a question for the court. Aetna Casualty &
Surety v. Wild, 944 S.W.2d 37, 41 (Tex.App.--Amarillo 1997, writ denied).
            Boyd contends that the Partnership waived the error by failing to object. See Green Intern.,
Inc. v. Solis, 951 S.W.2d 384, 389 (Tex. 1997)(if no objection is made to the failure to segregate,
then the complaint is waived). The Partnership did not expressly object at trial on this ground
although it had an opportunity to do so, but it did raise the issue in a post-judgment motion.


 Some
courts have held that raising the segregation issue in a post-judgment motion is sufficient to preserve
this type of error in a non-jury trial. O’Farrill Avila v. Gonzalez, 974 S.W.2d 237, 249 (Tex.App.--San Antonio 1998, pet. denied); Southern Concrete Co. v. Metrotec Financial Inc., 775 S.W.2d 446,
450 (Tex.App.--Dallas 1989, no writ). Other courts question whether this satisfies the
contemporaneous objection requirement. See Tipton International, Inc. v. Davenport, No.
10-02-00242-CV, 2004 WL 1474663, *6 (Tex.App.--Waco 2004, no pet.)(questioning whether
raising issue in post-judgment motion preserves error). Assuming that error is preserved, Boyd’s
defenses and counterclaims were so intertwined that segregation was not necessary. See Stewart
Title Guaranty Corp. v. Sterling, 822 S.W.2d at 11.
            The Partnership also argues that the trial court abused its discretion by determining that
$187,185.10 in attorney’s fees is a reasonable and necessary fee for services rendered by Boyd’s
attorneys at the trial court level. A determination of reasonable attorney's fees is a question for the
trier of fact. Sterling, 822 S.W.2d at 12; Cordova v. Southwestern Bell Yellow Pages, Inc., 148
S.W.3d 441, 445 (Tex.App.--El Paso 2004, no pet.). The amount of a fee award rests in the sound
discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of
discretion. Cordova, 148 S.W.3d at 445-46. Even though the appropriate standard of review is
abuse of discretion, we may nevertheless review a fee award for sufficiency of the evidence. 
Sterling, 822 S.W.2d at 11; Cordova, 148 S.W.3d at 446. This hybrid analysis requires a
two-pronged inquiry. Did the trial court have sufficient information upon which to exercise
discretion and, if so, did the trial court err in the application of its discretion? Cordova, 148 S.W.3d
at 446. The traditional sufficiency review comes into play with regard to the first question; however,
our inquiry cannot stop there. Id. We must proceed to determine whether, based on the elicited
evidence, the trial court made a reasonable decision. Id. Stated inversely, we must conclude that
the trial court’s decision was neither arbitrary nor unreasonable. Id.
            The Partnership states its challenge only in terms of legal sufficiency and we will restrict our
review to that standard. Boyd was represented at trial by Hazen and Terrill of Austin, Texas. 
Vincent Hazen had practiced in the area of commercial litigation and had handled numerous real
estate litigation cases. He was familiar with the customary and reasonable rates charged to handle
litigation such as that involved here. Both Hazen and his partner Paul Terrill charged $225 per hour
for this type of litigation. Hazen also utilized the firm’s law clerks to work on the case and billed
$35 to $65 per hour based on the clerk’s experience. The Partnership amended its petition several
times and there had been a number of depositions. Hazen and Terrill had successfully litigated a
motion for summary judgment, a temporary injunction, and a motion to compel. The firm had either
brought or responded to numerous other pleadings and motions. Hazen introduced into evidence the
bills from February of 2000 through the date of the hearing reflecting that the total amount of
attorney’s fees incurred was $228,053.76. That figure included $28,392.50 in fees attributable to
the severed litigation and to litigation in Winkler County which had since been non-suited. The
amount of attorney’s fees related solely to the instant case was $199,661.26. Hazen’s firm had also
retained Tom Scott, a Midland attorney, to assist in the preparation of the case, and had paid him an
additional $9,000 for his services. Hazen requested that the court award the full amount of
$237,053.76 for attorney’s fees since all of the litigation was interrelated. This evidence is legally
sufficient to support the trial court’s determination that attorney’s fees in the amount of $187,185.10
was reasonable and necessary. We conclude that the trial court did not abuse its discretion in so
finding.
            The Partnership also argues that the award of prejudgment interest on the fees is improper
because the entire amount had not been paid by the time the court entered the judgment. Generally,
an award of prejudgment interest may be based on either an enabling statute or under general
principles of equity. Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 551-52 (Tex. 1985). 
Interest as interest (eo nomine) is compensation for the use or detention of money. Id. at 552. 
Interest as damages is compensation allowed by law as additional damages for lost use of the money
during the lapse of time between the accrual of the claim and the date of the judgment, i.e.,
prejudgment interest. Id. 
            Prejudgment interest is generally not allowed on an award of attorney’s fees. C & H
Nationwide, Inc. v. Thompson, 903 S.W.2d 315, 325 (Tex. 1994). However, in A.V.I., Inc. v.
Heathington, 842 S.W.2d 712, 717 (Tex.App.--Amarillo 1992, writ denied), the Amarillo Court of
Appeals concluded that prejudgment interest on attorney’s fees paid at the time of judgment is
recoverable. On February 8, 2001, Mr. Boyd testified that he had paid “near $100,000” in attorney’s
fees related to the instant case. That same day, Hazen introduced Defense Exhibit 50 which
contained all of the billing statements that Hazen and Terrill had actually submitted to Boyd. Each
bill reflected that it was “due upon receipt.” Hazen had not yet billed Boyd for legal services
rendered since February 1, 2001. Other than Boyd’s testimony that he had paid “near $100,000” in
attorney’s fees as of February 8, 2001, there is no evidence that Boyd had actually paid the remaining
$87,185.10 by the time judgment was entered on September 3, 2004. Point of Error Ten is sustained
in part as to the award of prejudgment interest on attorney’s fees.
THE PARTNERSHIP’S ATTORNEY’S FEES
            In Point of Error Eleven, the Partnership asserts that the trial court erred by failing to award
its attorney’s fees. This portion of the brief contains three sentences unsupported by citation to
authority or legal argument. Rule 38 of the Rules of Appellate Procedure provides that a brief shall
contain, among other things, a clear, concise argument for the contentions made with appropriate
citations to authority and to the record. See Tex.R.App.P. 38.1; City of Midland v. Sullivan, 33
S.W.3d 1, 10 n. 6 (Tex.App.--El Paso 2000, pet. dism’d w.o.j.). Bare assertions of error, without
citations to authority, are insufficient to preserve error for our review. See Thedford v. Union Oil
Co., 3 S.W.3d 609, 616 (Tex.App.--Dallas 1999, pet. denied). Point of Error Eleven is overruled.
DELAY BETWEEN TRIAL AND ENTRY OF JUDGMENT
            In its final point of error, the Partnership complains that the award of prejudgment interest
unfairly punishes it due to the significant delay between trial and the entry of judgment. We
understand the Partnership to address this argument to the prejudgment interest on both actual
damages and attorney’s fees. Since we have determined that the award of prejudgment interest on
attorney’s fees should be reversed and the cause remanded for a re-determination of that award, it
is unnecessary to address that issue in the context of this point of error. We will limit our review to
the award of prejudgment interest on actual damages.
            The Partnership argues that the award of prejudgment interest should be set aside because
it serves as punishment. The primary objective of awarding damages in civil actions has always been
to compensate the injured plaintiff, rather than to punish the defendant. A.V.I., 842 S.W.2d at 718,
citing Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552 (Tex. 1985). An award of
prejudgment interest does not punish the defendant, but instead is intended to compensate the
plaintiff. We understand the Partnership to argue that the award of prejudgment interest here is an
abuse of discretion due to the significant delay between trial and the entry of judgment. In making
this argument, the Partnership implies that the delay is attributable to unexplained inaction of the
trial court. This is contrary to the record since a significant portion of the delay is attributable to the
surface ownership litigation brought by the Partnership.


 Under these circumstances, we are unable
to conclude that the award of prejudgment interest is an abuse of discretion. Point of Error Twelve
is overruled.
            Having sustained Point of Error Ten in part, we reverse the award of prejudgment interest
on attorney’s fees. Because there is evidence supporting the award of prejudgment interest on at
least a portion of the attorney’s fees, rendition is inappropriate. We therefore remand to the trial
court for further proceedings on the narrow issue of the appropriate amount of prejudgment interest
on Boyd’s attorney’s fees. The award should be limited to the amount of attorney’s fees actually
paid by Boyd as of September 3, 2004. We affirm the remainder of the trial court’s judgment.


November 17, 2005                                                     
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Barajas, C.J., McClure, and Chew, JJ.